915 So.2d 786 (2005)
Corey TRUITT
v.
TEMP STAFFERS.
No. 2004 CA 0590.
Court of Appeal of Louisiana, First Circuit.
April 6, 2005.
*787 Michelle Sorrells, Baton Rouge, Counsel for Claimant/Appellant Corey Truitt.
Sammie M. Henry, Baton Rouge, Counsel for Defendants/Appellees Temp Staffers and Louisiana Workers Compensation Corporation.
Before: PARRO, KUHN, and WELCH, JJ.
*788 KUHN, J.
In this workers' compensation suit, defendants, Louisiana Workers Compensation Corporation ("LWCC") and Temp Staffers, filed a motion to modify a consent judgment, seeking to terminate workers' compensation benefits that they have been paying to claimant, Corey Truitt, following a work-related injury. The workers' compensation judge ("WCJ") signed a judgment that granted defendants' motion. Claimant has appealed. Because we find the WCJ committed an error of law, which interdicted its fact-finding process and its ultimate ruling, we vacate the ruling and conduct a de novo review of the record. Based on our own conclusion that claimant's workers' compensation benefits should be terminated, we grant defendants' motion to modify the consent judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND
Truitt suffered a work-related accident on August 21, 1996, while unloading a china cabinet from a delivery truck.[1] As he stepped backwards off of the truck, he stepped on an acorn, fell to the ground, and the china cabinet fell onto his abdomen. Truitt immediately experienced pain in his left ankle and his back and sought medical treatment. About two to three weeks later, he developed back pain and progressive leg weakness, which caused difficulty in walking. He was evaluated by Dr. Thomas Kilroy, an orthopedic surgeon, who prescribed physical therapy treatments. Truitt's condition worsened to the point where he became wheel-chair bound. Dr. Kilroy referred him to Dr. Arthur Neil Smith, III, a neurologist. After extensive testing, Dr. Smith diagnosed cauda equina syndrome and indicated that Truitt's condition was "probably due to vascular insufficiency caused by his work accident."[2] Dr. Smith prescribed long term physical therapy.[3]
Truitt was further evaluated by Dr. Austin J. Sumner, another neurologist, who initially diagnosed "persistent paraplegia from cauda equina syndrome." Thereafter, in a letter to LWCC, dated October 13, 1997, Dr. Sumner reported that based on the results of electrodiagnostic studies, he had changed his diagnosis to Guillain-Barre' Syndrome ("GBS"), an acute axonal motor neuropathy, and noted, "it is uncertain whether [Truitt] has a continuing immune attack on his peripheral nerves, and in fact should be regarded as a chronic CIDP [chronic inflammatory demylenating polyneuropathy] with a GBS-like onset." Dr. Sumner further opined that medical literature did not support the traumatic onset of GBS, supporting defendants' claim that Truitt's neuropathy was not work-related. Regarding treatment, Dr. Sumner recommended a course of intravenous immunoglobulin treatments ("IVIG treatments") to suppress the autoimmune process.
Although Truitt received workers' compensation benefits following his August 1996 injury, his benefits were apparently *789 terminated by LWCC in October 1997, based on Dr. Sumner's medical opinion that Truitt's condition was not work-related.
Ultimately, Truitt saw a third neurologist, Dr. Steven Zuckerman, in May 1998. At that time, Truitt's lower extremity weakness persisted, and Dr. Zuckerman found Truitt's symptoms were either traumatically-induced cauda equina syndrome or immune-mediated polyneuropathy. He found either syndrome was related to Truitt's work accident, stating, "Exact mechanism is unprovable, of course, but in my mind the temporal sequence is very compelling."
At that time, Truitt had a pending claim for workers' compensation benefits, and due to the conflicting medical opinions, the WCJ appointed an independent medical examiner ("IME"), Dr. Leo A. deAlvare, another neurologist. After an August 1998 evaluation, Dr. deAlvare offered the following opinion:
[Truitt] has a chronic, relapsing form of inflammatory demyelinating polyradicular neuropathy of an axonal type. This entity is not exactly [GBS].... [W]ith a clear temporal pattern and no other etiology to explain [Truitt's] lower extremity weakness, I feel that most likely his current lower extremity neuropathy is more likely than not related directly to his trauma on August 21, 1996.... In terms of his prognosis, ... [h]e is probably going to have continuing lower extremity weakness [and will] need at least a few more rounds of IV immunoglobulin and perhaps other treatments .... Currently, [Truitt] is impaired in terms of his functioning.... I do not think he could perform any activities that have to do with walking, climbing, bending, stooping, etc.... I do think that he could do some type of sedentary employment where he uses upper extremity strength and dexterity.
On December 9, 1998, following the receipt of Dr. deAlvare's medical opinion, the WCJ signed a consent judgment, pursuant to which Truitt's compensation benefits were reinstated, retroactive to October 28, 1997. This judgment also provided, "Indemnity benefits will continue until such time as claimant is able to return to gainful employment at which time they may be reduced or terminated as provided by the Workers Compensation Act." Defendants further agreed to pay "all reasonable and necessary medical expenses for treatment related to the August 21, 1996 injury and subsequent treatment for the condition of inflammatory demyelinating polyradicular neuropathy."[4]
Thereafter, Truitt continued to regularly see Dr. Zuckerman, and he received frequent IVIG treatments.[5] During December 1998, updated laboratory data showed that Truitt's hepatitis B antigen antibody and core antibodies tested positive. In January 1999, Truitt's hepatitis serologies also tested positive. In a February 22, 1999 letter to a LWCC claims representative, Dr. Zuckerman provided an updated evaluation of Truitt's condition and stated, "Truitt apparently has ongoing inflammatory *790 polyneuropathy on an immune mediated basis. I do not think that this condition was caused by his [work accident]. Dr. Sumner's position regarding [Truitt's GBS] being possibly related to [the work accident] would not apply to this current problem given the updated laboratory data."
Defendants filed a motion to modify the consent judgment, apparently based on Dr. Zuckerman's change of opinion regarding the etiology of Truitt's medical condition. Thereafter, in a February 3, 2000 letter to Truitt's counsel, Dr. Zuckerman reported, in part, as follows:
Truitt, at this time is considered to have CIDP and not, in fact, [GBS]. This peripheral nerve condition is not related to his accident.... I do not think that [Truitt's] work injury has contributed in any significant way to [his] limitations for working.
His CIDP, on the other hand, poses severe restrictions given his ongoing leg weakness.
By letter dated July 18, 2000, Dr. Smith offered his updated opinion regarding Truitt's condition, indicating he still believed it was related to the work accident:
I have, in fact, been able to do a [nerve conduction test] on [Truitt] in the past week and find ... it is completely normal. There is certainly no conduction block to indicate CIDP. Sometimes with treatment; (sic) however, the conduction block disappears. At this point; (sic) however, I doubt that this is CIDP and feel like what ever happened to him is probably related to his original accident, though I can't explain why or what the lesion is, and nobody else can either. He did have a slight elevation of protein on the lumbar puncture that I [performed]; however, that could be explained by either trauma to the spinal cord, nerve roots, [GBS], or CIDP. At this point, I doubt that [Truitt] will ever be diagnosed to everyone's satisfaction....
At this time, Dr. deAlvare re-evaluated Truitt and ordered additional testing. Dr. deAlvare's September 13, 2000 progress notes set forth his updated impressions, in part, as follows:
My impression is that he has a proximal demyelinating type neuropathy that is related to his [August 1996] injury, and complications stemming from that injury. He does have some history of hepatic inflammation/hepatitis which does muddy the picture somewhat. The in-sighting agent in CIDP need not be a chronic process but is more likely to be a one time trigger which begins a cascade of an ongoing auto-immune process. I do not believe that he has a cauda equina syndrome however his response to [IVIG treatments] has been less than stellar.
In October 2000, defendants again dismissed their pending motion to modify the consent judgment.
Subsequently, Truitt continued to see Dr. Zuckerman, who continued ordering IVIG treatments. In December 21, 2000, Truitt was receiving these treatments every four weeks, and Dr. Zuckerman noted that this frequency "is adequate to enable him to remain ambulatory." However, following a decrease in the frequency of IVIG treatments, Dr. Zuckerman noted in November 2002, that Truitt had experienced some loss of strength in his legs and was having difficulty getting around.
Although the record does not establish the applicable dates, Truitt apparently worked as a bus driver for some period of time during which he had regained strength in his legs. Dr. Zuckerman's January 13, 2003 progress note indicates Truitt requested that he be able to receive *791 his IVIG treatments at the frequency of every three weeks so that he did not lose his job. However, in March 2003, Truitt was ambulating with a cane, and by June 2003, he was using a walker and reported not having worked since March because of his leg weakness. As of June 17, 2003, Dr. Zuckerman responded to a medical case management questionnaire, indicating he thought Truitt was exaggerating his symptoms and was capable of sedentary work. Also in June 2003, Dr. Zuckerman suggested that Truitt receive another neurological opinion, stating, "I am unclear that we are providing the necessary interventions... that are indicated." As of August 2003, Truitt was still receiving IVIG treatments, which were ordered by Dr. Zuckerman.
Truitt had also been evaluated by a rheumatologist, Dr. Stephen Lindsey, in September 2002. Dr. Lindsey diagnosed CIDP based on Truitt's history and found no evidence of other autoimmune rheumatic diseases. Regarding the etiology of the CIDP, Dr. Lindsey reported in a September 24, 2002 letter to LWCC:
[I]t could be related to an occult inflammatory process such as chronic hepatitis.... It could also just be what happens frequently in an idiopathic finding where no one is sure what sets off such a neuropathy. As regards the previous trauma producing a chronic immune process, this would be very unusual.... Obviously an underlying immune process might be aggravated by trauma of any type though the aggravation would be short-lived. The process itself however would continue.
In July 2003, defendants filed a motion for modification of the consent judgment based on Dr. Lindsey's and Dr. Zuckerman's diagnoses of CIDP and their opinions that CIDP is an autoimmune disorder that is not related to trauma. A November 7, 2003 hearing was held, during which both Dr. Zuckerman and Dr. Smith testified, and the parties offered medical reports and depositions regarding Truitt's previous medical history.
Dr. Zuckerman testified that Truitt had not experienced back pain or leg weakness prior to the work-related accident. He related that he initially believed that Truitt suffered from an acute inflammatory demyelinating polyneuropathy ("AIDP"), which was caused by the work-related accident. As of 1999, Dr. Zuckerman still found the close temporal element between the time of the accident and the development of Truitt's symptoms to be very compelling, but Dr. Zuckerman explained that he changed his opinion regarding the etiology of Truitt's condition when he later determined that Truitt suffered from CIDP. Dr. Zuckerman explained that a 1998 abnormal muscle biopsy indicated that a pathology existed before that point.
As of the date of the hearing, however, Dr. Zuckerman believed Truitt did not have CIDP. He stated he was not sure from which condition Truitt actually suffered; he indicated Truitt's condition might be more of a psychosomatic disease, not traumatically induced. Dr. Zuckerman pointed out that Truitt's symptoms tend to cycle, and he testified, "Either he has nothing wrong with him and this is all malingering, or the IVIG is treating some other as yet unknown and undiagnosed condition." Dr. Zuckerman noted that if Truitt suffered from something physical, it was immune-related because Truitt apparently responds positively to the IVIG treatments. He stated that Truitt reports becoming "bed bound" without the [IVIG] treatments. Dr. Zuckerman explained there is no other condition that IVIG treats except immune mediated conditions.
Dr. Zuckerman further testified that if Truitt's condition is immune-related, he *792 could not relate it to the trauma he had suffered seven years earlier. Dr. Zuckerman acknowledged, "Something happened to [Truitt] after his accident." But he further testified, "[W]hether or not that persisted and is causing problems today is... virtually impossible." Dr. Zuckerman stated the difference in his opinion from that of Dr. Smith's was that Dr. Smith believed that "there is somehow a mechanism of disease by which trauma seven years ago is inducing [Truitt's] fluctuating weakness."
At the time of the hearing, Truitt was receiving an IVIG treatment about every three weeks, with each treatment costing $10,000.00. Although Dr. Zuckerman did not believe that Truitt needed these treatments, he testified that he has continued to order the treatments because Truitt reports that it improves his condition.
Dr. Smith had examined Truitt about three weeks before the hearing. He found that Truitt was weak in his hips and legs and could not get out of a chair without assistance. Dr. Smith opined that, as of the hearing date, he did not know from which condition Truitt suffered. He testified, "I do not have a diagnosis, and nobody else does. [Truitt's] seen [four] neurologists... and nobody has really come up with a hard and fast diagnosis."
In Dr. Smith's opinion, when Truitt was struck in his abdomen during the work accident, he "must have infracted something supplying the cardia (sic) equina" or the trauma of the accident brought about some inflammatory change. Dr. Smith believed that Truitt's leg weakness was related to the work accident, because his symptoms developed in close proximity to the accident and because testing performed soon after the accident revealed elevated spinal fluid proteins.
Regarding treatment of Truitt's condition, Dr. Smith recommended no treatment if Truitt actually suffered from cauda equina. Dr. Smith explained that IVIG infusions are not used in treating traumatic illnesses. He also testified that he does not believe Truitt has CIDP, and because IVIG treatments are unnecessary if Truitt does not have CIDP, he recommended stopping the IVIG treatments.
After hearing the testimony of Drs. Zuckerman and Smith, the WCJ granted defendants' motion to modify the consent judgment, finding that indemnity and medical benefits should be terminated. In a November 7, 2003 ruling, the WCJ found that "any condition suffered as a result of the August 21, 1996 injury should have resolved and there is no condition, presently treated by the [IVIG] treatments, that are related to the August 21, 1996 work accident."
Truitt has appealed, urging in his appellate brief that: 1) defendants failed to prove a change of conditions existed to support a modification of the consent judgment, and 2) the medical evidence establishes that Truitt's present condition is related to his work accident. Additionally, in oral arguments before this court, Truitt's counsel urged that this court should conduct a de novo review of the evidence presented because the WCJ had committed legal error by failing to consider all of the medical evidence introduced at the hearing.

II. ANALYSIS

A. Standard of Review
Factual findings in a workers' compensation case are typically subject to the manifest error standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556. But where one or more legal errors on the part of the WCJ interdicts the fact-finding process, *793 and the record is otherwise complete, the reviewing court should make an independent de novo review of the evidence, giving no deference to the WCJ's factual findings, and render judgment. Dowell v. Ochsner Clinic of Baton Rouge, 03-0460, p. 5 (La. App. 1st Cir.3/10/04), 874 So.2d 852, 855-56.
During the hearing, the WCJ commented that she had not had "a chance to read all of this," apparently referencing medical reports and depositions regarding Truitt's previous medical history that had been introduced at the beginning of the hearing. Prior to ruling, the WCJ made another statement specifically indicating she had not read one of the medical depositions. And when claimant's counsel questioned whether the WCJ was taking the matter under advisement (presumably so that the WCJ would have an opportunity to review the evidence introduced at the beginning of the hearing), the WCJ answered, "No.... I think even if I tried to read this stuff, it could not be clearer to me than having these two gentlemen [Drs. Zuckerman and Smith] here talking to me about it today." Immediately following that comment, the WCJ ruled on the motion.
On appeal, Truitt's counsel argues it was error for the WCJ to fail to consider Truitt's extensive medical history, including previous medical opinions regarding the etiology of Truitt's condition. We agree.
When a WCJ makes a consequential error in the exclusion of evidence, no weight should be accorded the WCJ's findings tainted by that error. See McLean v. Hunter, 495 So.2d 1298, 1304 (La. 1986). Although in this case, evidence was not actually excluded, the record establishes the WCJ did not consider any evidence other than the live testimony of Drs. Zuckerman and Smith. Truitt was entitled to have the remaining evidence considered prior to a ruling being made. Granted, the WCJ may have rendered the same ruling if the evidence in question had been considered, but we are unable to state with any degree of certainty that she would have done so. Included within the medical records that the WCJ did not consider were those of the IME, Dr. deAlvare, who opined more than four years after the accident that Truitt's condition was related to his work injury. If the WCJ had fully considered these records, she may have placed more weight on Dr. Smith's trial testimony, which also supported a finding that Truitt's current condition remained related to his work injury, and discounted Dr. Zuckerman's trial testimony to the contrary. In light of this consequential legal error, we must make an independent review of the record and determine which party should prevail. See Bullard v. State, Dep't of Transp. & Dev., 98-1942, p. 4 (La.App. 1st Cir.11/5/99), 744 So.2d 212, 215, writ denied, 99-3468 (La.2/11/00), 754 So.2d 939.

B. Change of Conditions
Truitt argues on appeal that defendants have not shown a change in Truitt's condition since the date of the consent judgment. Truitt contends that a party who seeks modification of a workers' compensation judgment must prove by a preponderance of the evidence that the claimant's disability has either increased or diminished.
Louisiana Revised Statutes 23:1310.8 states, in pertinent part, as follows:
A. (1) The power and jurisdiction of the workers' compensation judge over each case shall be continuing and he may, upon application by a party and after a contradictory hearing, make such modifications or changes with respect to *794 former findings or orders relating thereto if, in his opinion, it may be justified....
. . . .
B. Upon the application of any party in interest, on the ground of a change in conditions, the workers' compensation judge may, after a contradictory hearing, review any award, and, on such review, may make an award ending, diminishing, or increasing the compensation previously awarded, subject to the maximum or minimum provided in the Workers' Compensation Act, and shall state his conclusions of fact and rulings of law ....
(Emphasis added.)
This statutory language is broad and does not necessarily limit the requisite change in conditions to a physical change in the claimant's condition. In Critser v. Dillard's Department Stores, Inc., 99-3113 (La.App. 1st Cir.2/16/01), 791 So.2d 702, writ denied, 01-0753 (La.5/4/01), 791 So.2d 659, this court found that a change in the jurisprudence affecting the employer's entitlement to an offset for claimant's social security constituted a "ground of a change in conditions" sufficient to support claimant's motion for modification of the consent judgment.[6]
In the present case, however, the record establishes that Truitt's condition has improved to some extent; the evidence reveals that Truitt worked as a bus driver for a period of time. And although Truitt still has difficulty walking, he is no longer in a persistent state of paraplegia. Additionally, following execution of the 1998 consent judgment, multiple physicians performed updated medical testing and evaluations of Truitt's condition that have resulted in new medical diagnoses. These new diagnoses have significant bearing on the etiology of Truitt's condition and have bearing on what type of medical treatment he should receive. Since 1998, both Drs. Zuckerman and Smith have concluded that IVIG therapy is no longer an indicated treatment for Truitt's medical condition. Considering all of these facts, we find defendants established a sufficient ground of a change in conditions to support their motion for modification.

C. Modification of Benefits
Truitt asserts that the record contains sufficient medical evidence to support the conclusion that his present condition is related to his work accident. He further contends that in determining whether his benefits should be modified, he is entitled to the legal presumption that his condition *795 is related to the work accident, citing Peveto v. WHC Contractors, 93-1402 (La.1/14/94), 630 So.2d 689. The Peveto court, quoting Walton v. Normandy Village Homes Ass'n, Inc., 475 So.2d 320, 324-325 (La.1985), addressed this legal presumption:
[W]hen an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, the employee's work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability.
(Emphasis added.)
Peveto, 630 So.2d at 691. The Peveto court further reasoned:
Once the employee has established the presumption of causation, the opposing party bears the burden of producing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the preexisting disease or infirmity to produce his disability.
Id.
Although it is not clear whether Truitt acknowledges he had some type of preexisting neurological condition before the work accident, he argues the WCJ failed to apply the standards set forth in Peveto. He claims that he established a causal link between the work accident and his present disability, and that the medical evidence establishes a "reasonable possibility" that the work injury is causally related to his neurological condition.
We note that Truitt has been receiving workers' compensation benefits, and defendants do not presently argue that Truitt did not sustain a work-related injury. In support of their motion for modification, defendants argue that the medical evidence establishes Truitt is no longer entitled to receive indemnity or medical benefits because his present medical condition is not related to the work accident.
We agree that the weight of the medical evidence establishes that any disability that initially resulted from the work accident has resolved, and any remaining disability results from an immune-related process that was not caused or aggravated by the work accident. The medical evidence establishes that if any aggravation occurred due to the work injury, such aggravation was of a short duration and is not related to Truitt's present condition. Accordingly, defendants have rebutted any presumption that may have arisen in Truitt's favor.
Truitt urges that great weight should be placed on the opinion of the IME, Dr. deAlvare. An IME's medical opinion should be given significant weight because the IME is an objective party; however, the opinion is not conclusive. Mosley v. Pennzoil Quaker State, 37,199 (La.App.2d Cir.7/23/03), 850 So.2d 1100, writ denied, 03-2412 (La.11/21/03), 860 So.2d 553. In this case, the evidence presented does not include an updated opinion from Dr. deAlvare addressing Truitt's condition at the time of the hearing; his last report was dated September 13, 2000. Additionally, Truitt's treating physician, Dr. Zuckerman, did not agree with the opinions of Dr. deAlvare. Dr. Zuckerman thought Dr. deAlvare was not "sufficiently familiar with the effects [of hepatitis antigens] on the immune system" to render a correct opinion. Dr. Zuckerman explained these antigens can be a "chronic immune *796 stimulator," supporting his determination that Truitt's present condition was a chronic immune-related process, if not a psychosomatic condition, and that in either case, Truitt's present condition was not related to the 1996 work injury.

III. CONCLUSION
Based on our de novo review of all of the evidence presented, we find that Truitt's present medical condition is not related to the previous work accident, and he is no longer entitled to receive workers' compensation benefits. Accordingly, we grant defendants' motion to modify the consent judgment and render judgment terminating Truitt's workers' compensation benefits. All costs of this appeal are to be paid by claimant-appellant, Corey Truitt.
VACATED AND RENDERED.
NOTES
[1] In some of the medical records, the item of furniture is described as an entertainment center. It is undisputed that the item of furniture involved in the accident was a large, heavy one.
[2] The cauda equina is a bundle of lumbar and sacral nerve roots that come up from the bottom of the spinal cord.
[3] In November 1996, Truitt was evaluated by Dr. Steven M. Bailey, a neurosurgeon, who diagnosed lower extremity weakness of unknown etiology. Although Dr. Bailey believed Truitt's symptoms were genuine, he could not provide "a good explanation for his weakness" and saw no basis for surgical intervention.
[4] The judgment actually refers to CBC Temporary Staffing rather than Temp Staffers. Because this record does not contain all pleadings from the original proceedings, we cannot discern the reason for the disparity in the names of these parties. Since the parties have not raised an issue regarding this disparity, we presume Temp Staffers is somehow responsible for CBC Temporary Staffing's obligations under this judgment. For convenience, we refer to Temp Staffers as the defendants throughout these proceedings.
[5] Truitt received the IVIG infusions over a three-day period as often as every three weeks in an effort to control debilitation of his condition.
[6] Usually, once a judgment has become final and definitive, parties are bound by it, regardless of any future change of circumstances. See La. C.C.P. arts. 1841, 425; Critser v. Dillard's Department Stores. Inc., 99-3113 at p. 5; 791 So.2d at 706. In Critser, this court explained that workers' compensation judgments are treated differently from ordinary judgments:

This is due to the fact that if the rules of finality applied to ordinary civil judgments are applied to workers' compensation judgments, the flexibility of the workers' compensation system would be greatly restricted. The supreme court reaffirmed the validity of this policy by holding in Jackson v. Iberia Parish Gov't, 98-1810, p. 9 (La.4/16/99), 732 So.2d 517, 524, that where the legislature has expressly provided that an award or judgment can be subject to a claim of modification, res judicata does not apply.
[Louisiana Revised Statutes 23:1310.8 is] such a modification statute.
(Citation omitted.)
Defendants' motion for modification of the prior consent judgment requires litigation of Truitt's present disability status and its relation to the prior work-related injury. That cause of action did not exist at the time of the first adjudication. Thus, defendants' petition for modification cannot be barred by res judicata. See Jackson v. Iberia Parish Gov't, 98-1810, p. 10 (La.4/16/99), 732 So.2d 517, 524.